UNITED STATES OF AMERICA
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:12-00161 |
| | ) | Judge Sharp |
| ZEID HASAN PRATT | ) | |

## MEMORANDUM

Pending before the Court is a Motion to Suppress which arose after Defendant was stopped while traveling on Interstate 40 in Nashville, Tennessee, and the automobile he was driving subjected to a "dog sniff," leading police to search the vehicle and discover what appeared to be narcotics and drug paraphernalia. The Court held an evidentiary hearing on the Motion on June 17, 2013, following which it received supplemental briefing from both parties. For the reasons that follow, the Motion to Suppress will be denied.

## I. FACTUAL FINDINGS

During the course of the evidentiary hearing, the Court heard from one witness, Metropolitan Nashville Police Officer Jamie Scruggs ("Scruggs"), and admitted three exhibits into evidence: Mapquest driving directions, Scruggs' police report, and a DVD recording of the traffic stop at issue. Having reviewed the evidence and listened to the witness's testimony, and after considering his interests and demeanor, the Court finds the following to be the relevant facts. Because these are the Court's findings, any contrary testimony on a specific matter has been rejected in favor of the specific fact found.

Just after 9 a.m. on July 16, 2012, Scruggs was on duty, driving on Interstate 40 in Bellevue, when he observed a grey Hyundai Sonata, bearing Pennsylvania tags, which Scruggs judged to be

1

following the vehicle in front of it too closely in violation of Tenn. Code Ann. § 55-8-124. Scruggs activated his blue lights, briefly sounded his siren, and initiated a traffic stop. The Sonata pulled to the right shoulder and, after a few seconds, came to a stop. There were two occupants in the vehicle.

Upon approaching the vehicle on its passenger side, Scruggs greeted the occupants, obtained the driver's license and the car rental agreement and registration, and asked the driver, Defendant Zeid Hasan Pratt, to step back to his patrol car. Pratt and Scruggs stood near the front of the patrol car, where Scruggs informed Pratt that he had stopped him for following too closely, and asked him a number of questions, among them where he was from, who his passenger was, where they were going, where they had been, how long they had been there, and the purpose of the trip. Responding to the questions, Pratt stated that he and his friend (Francis Gallo) were from outside Philadelphia, had been in Dallas, Texas, for a "couple of days" to visit his aunt and a cousin that he had not seen in several years who was getting married. They stayed at his aunt's house, Pratt told Scruggs, and his friend had helped him drive.

Although he initially stopped the vehicle for following too closely, Scruggs wrote in his police report and subsequently testified that he became very suspicious after his initial questioning of Pratt. To Scruggs, that suspicion was derived from a number of factors, which varied in importance: Pratt was slow to pull over, was driving a rental car, had a nervous demeanor, stuttered and spit while speaking, told a vague story about the details of his trip, had a friend helping him drive cross country, and was traveling approximately 48 hours by car round-trip for a two-day weekend in Dallas, which Scruggs knew to be a hub of illegal narcotics activity. His suspicions of criminal drug activity thus aroused, Scruggs determined that the quickest way to confirm or reject the suspicions was to talk to the passenger. With Pratt's consent, Scruggs briefly checked him for

2

weapons, then headed back toward the Sonata, radioing for backup as he approached.

At the passenger side of the vehicle, Scruggs asked Gallo similar questions concerning their trip. Scruggs asked if Gallo was helping him drive, and Gallo replied, "not anymore," clarifying that he was not currently driving on this leg of the trip. Gallo told him that they were in Dallas to "hang out, for the weekend, basically," were headed back to Pennsylvania, and that the wedding would not take place until the following weekend. He said he and Pratt had been friends their whole lives. To Scruggs, Gallo seemed very nervous and was very vague on the details on the trip. The elapsed time between the moment Scruggs left Pratt's presence in order to question Gallo, to the time he returned to run Pratt's license, was approximately 70 seconds.

When Scruggs returned to the patrol car, he continued to ask questions of Pratt while entering his driver's license information into the computer and awaiting the results of the check. During this exchange, Pratt disclosed that he and Gallo did not go out during their visit to Dallas, were "just visiting family" and mostly hung out with family and ate "barbeque and stuff like that." He said he hadn't seen his cousin in "maybe 10 years, 20 years." He also said that he and Gallo left Dallas at "midnight-ish, 12:15 maybe" to avoid traffic near Little Rock, Arkansas, and that they expected to make it home to Pennsylvania by 9 p.m. Scruggs asked whether there were weapons or hard drugs in the car, and Pratt specifically denied having each of several specific forms of contraband in the automobile.

By this time, Officer Hacker had arrived as backup. The computer report was still pending. Scruggs asked Pratt for consent to search the vehicle, and Scruggs did not answer directly at first. Eventually, he refused to give consent, while Scruggs informed Pratt that he had a constitutional right to refuse and that it would not anger him if consent was refused. It was, Scruggs explained,

part of his job to get drugs off of interstates. Pratt agreed that it was important to prevent drug trafficking on interstates, and then, after a moment of silence, changed the subject and complimented Scruggs' patrol vehicle. Hacker, meanwhile, approached the Sonata and requested that Gallo exit the car, instructing him to stand near the wall.

Scruggs then brought his K9, Raven, out to perform a "dog sniff" around the perimeter of the vehicle. On the second pass around the vehicle, the dog "alerted" at the driver and passenger doors, and at the trunk, by scratching at the vehicle. Scruggs returned the dog to his car, and then noticed that the car registration check came back "no records found" on his computer. Scruggs informed the two men that he would search the vehicle, frisked them for contraband, and began to search the trunk. After what seemed to be several minutes, he discovered what appeared to be illegal narcotics, and Scruggs and Hacker took the men into custody.

## II. **LEGAL CONCLUSIONS**

Defendant does not challenge the lawfulness of the initial traffic stop. Instead, he argues that Officer Scruggs impermissibly exceeded the scope of the traffic stop when he asked a series of questions that were not focused on the traffic violation of following too closely. Scruggs thus transformed the stop into a detention for the purpose of investigating other illegal activity, Defendant contends, lacking the requisite reasonable suspicion. The United States responds that Scruggs' questioning of Defendant and his passenger, as well as the dog sniff, did not unreasonably prolong the stop or otherwise indicate that Scruggs had abandoned his original course of investigation. Secondarily, the government responds that if Scruggs did convert the traffic stop into a narcotics investigation, he did so based on reasonable suspicion.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons,

4

houses, papers, and effects, against unreasonable searches and seizures." Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of this provision. *Whren v. United States*, 517 U.S. 806, 810 (1996). An officer may stop a vehicle so long as the officer has probable cause to believe that a traffic violation has occurred, even if the basis for the stop is motivated by something other than the traffic offense itself, i.e., drug interdiction. *Id.*; *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). In other words, so long as there is an articulable legal basis for the stop – reasonable suspicion for a brief investigatory detention – "the officers' actual subjective motivations in effectuating the stop are irrelevant to the validity of the stop." *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008); *see United States v. Garrido*, 467 F.3d 971, 978 (6th Cir. 2006) ("'A police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct.'") (citation omitted). Here, Defendant does not challenge Officer Scruggs' initiation of a traffic stop for following too closely, even if his subjective reason for stopping Defendant was drug interdiction. And indeed, the Court finds that the stop was supported by probable cause. *See U.S. v. Bonilla*, 357 F. App'x 693, 695-96 (6th Cir. 2009) (finding that probable cause supported an Ohio traffic stop for following too closely).

"'[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.'" *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010) (quoting *Illinois v. Caballes,* 543 U.S. 405, 407 (2005)). If the basis for the initial stop was proper, courts ask "whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances."

5

*United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012) (quoting *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005)). "Alternatively, the police may extend a stop beyond the scope of what was originally permissible if 'something happened *during the stop* to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot.'" *Id.* (quoting *Davis*, 430 F.3d at 353) (alteration in original).

**A.    Scope of Initial Detention**

It has often been said that "the ultimate touchstone of the Fourth Amendment . . . is 'reasonableness.'" *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (citation and quotation marks omitted). In the Sixth Circuit, the reasonableness of police conduct during a traffic stop, even one supported by probable cause, is analyzed under the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *Everett*, 601 F.3d at 488 n.4. A seizure is reasonable under the *Terry* framework if the detention is "limited in [both] scope and duration." *Id.* at 488 (brackets in original) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983). An investigating officer must use "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," and the detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Royer*, 460 U.S. at 500.

While the *Terry* inquiry has two prongs – scope and duration, *see Everett*, 601 F.3d at 488 – they are not so neatly divided. This is particularly true when, as here, an officer has arguably extended a traffic stop by engaging in extraneous questioning. As a general rule, during a lawful traffic stop, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

6

Interpreting this language, the Sixth Circuit has held that there is no bright-line prohibition on prolonging a stop due to suspicionless unrelated questioning; instead, a court "must conduct a fact-bound, context dependent inquiry in each case" to determine "whether the 'totality of the circumstances surrounding the stop' indicates that the duration of *the stop as a whole* – including any prolongation due to suspicionless unrelated questioning – was reasonable." *Everett*, 601 F.3d at 493-94 (emphasis in original).[1] In determining whether the duration of a stop was too long, "the overarching consideration is the officer's diligence – i.e., his 'persevering' or 'devoted . . . application to accomplish [the] undertaking' of ascertaining whether the suspected traffic violation occurred, and, if necessary, issuing a ticket." *Id.* Both the subject and quantity of any extraneous questioning is relevant to the diligence inquiry. *Id.*

In his post-hearing brief, Defendant argues that "the stop from its inception was focused on other criminal activity unrelated to a traffic violation," and so, by implication, the stop was transformed into an investigation of other criminal activity at its inception. While Defendant does not precisely define "inception,"[2] he effectively argues that from the moment Scruggs initiated the traffic stop, he was actually investigating other criminal activity. Insofar as it concerns Scruggs' subjective intent for turning on his blue lights, however, this line of argument is foreclosed by *Whren*. 517 U.S. at 813 (constitutional reasonableness of traffic stops does not depend on an officer's subjective intentions); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) ("The

---

[1] After the initial stop has concluded, though, there is "a bright-line rule that any subsequent prolonging, even de minimis, is an unreasonable extension of an otherwise lawful stop." *Stepp*, 680 F.3d 661-62.

[2] "Inception" is defined as "an act, process, or instance of beginning . . . ." *Webster's Third New International Dictionary, Unabridged*, http://unabridged.merriam-webster.com.

7

stop is reasonable if there was probable cause, and it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop."). Indeed, Scruggs' subjective intentions are irrelevant as a matter of law throughout the stop. *United States v. Herbin*, 343 F.3d 807, 810 (6th Cir. 2003) (internal citation omitted) ("From beginning to end, the constitutionality of a traffic stop under the Fourth Amendment depends on the objectively reasonable justifications for the officers' actions, not their subjective intentions.").

Still, it is possible that Scruggs' actions during the stop manifested a lack of diligence in investigating the traffic violation of following too closely. After Scruggs first approached the car, it was permissible for him to instruct Defendant to exit the vehicle. *See Arizona v. Johnson*, 555 U.S. 323, 331 (2009) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (per curiam)). Scruggs' initial questioning of Defendant – asking him, *inter alia*, where he was going, where he had been, how long he had been there, why he was there, who his passenger was – were all permissible because they were "locomotion-related inquiries not strictly directed to the motorist's conduct at the time of the stop, such as '[the] motorist's travel history and travel plans' and 'the driver's authority to operate the vehicle . . . .'" *Everett*, 601 F.3d at 494. "Context-framing questions" like these "'may help explain, or put into context,' why the motorist was committing the suspicious behavior the officer observed," and "will rarely suggest a lack of diligence." *Id.* (internal citation omitted); *see also Stepp*, 680 F.3d at 662 (deputy asking driver questions about his authority to operate the vehicle, who owned it, where they were going, and where they were coming from were reasonable "context-framing" questions and did not indicate a lack of diligence, even if they prolonged the stop). Scruggs' initial questioning of Defendant was within the bounds of reasonable police conduct and did not indicate a lack of diligence.

8

As a general matter, "[r]equesting a driver's license, registration, rental papers, running a computer check thereon, and issuing a citation" are permissible police acts within the scope of a traffic stop. *Bonilla*, 357 F. App'x at 696 (speeding violation) (citing *Hill,* 195 F.3d at 269). Defendant argues that at the moment Scruggs ceased his initial questioning of him and went to question Gallo separately, all before returning to the police vehicle to run Defendant's driver's license, he abandoned the traffic stop prosecution and began (if not continued) a drug trafficking investigation. Defendant bases this argument in large part on the Sixth Circuit's observation in *United States v. Torres-Ramos* that "[i]ssuing a speeding ticket does not require an officer to detain an individual in order to separately question a passenger regarding ownership or travel plans." 536 F.3d 542, 551 (6th Cir. 2008); *see also Bonilla*, 357 F. App'x at 697 (characterizing the quoted passage as a holding).

But while *Torres-Ramos* demarcated the point at which a traffic stop ended and a separate seizure began, its holding was predicated upon two facts: (1) the driver was placed in the back of a police cruiser, and (2) the passenger was questioned separately. 536 F.3d at 551; *see also Bonilla*, 357 F. App'x at 697. A fair reading of the relevant portion of the opinion demonstrates that the custodial detention was more important to the analysis than the questioning of the passenger. *See Torres-Ramos*, 536 F.3d at 551 ("In this case, therefore, the purpose of the traffic stop ended when [the officer] put [the driver] in his patrol car . . . ." And, absent reasonable suspicion of criminal activity, it was "the detention" that violated the parties' rights.); *see also Bonilla*, 357 F. App'x at 697 ("Once the driver was placed in the patrol car for reasons such as failing to identify the owner of the vehicle he was driving, the [*Torres-Ramos*] court considered the original stop to have ended and a detainment requiring reasonable suspicion to have begun.") (footnote omitted). In the case

9

at bar, meanwhile, Scruggs did not detain Defendant in the police vehicle but instead appeared to instruct him to wait next to his car while he questioned Gallo separately. This is surely a more "limited intrusion" than physically taking Defendant into custody, *see Royer*, 460 U.S. at 500, and given the fact-specific nature of the inquiry, it is a distinction that matters. Moreover, while *Torres-Ramos* is binding precedent, courts have provided more detailed guidance in the five years since it was decided.

The relevant question, then, is whether Scruggs' decision to return to the car to question Gallo for approximately 70 seconds, viewed objectively and in light of the overall circumstances of the stop, indicates a lack of reasonable diligence in pursuing a traffic stop for following too closely.[3] In *Everett*, the Sixth Circuit elaborated on the analysis:

> Because the reasonable diligence standard does not "require [an officer] to move at top speed," here, too, some amount of questioning is permissible—so long as the officer's overall course of action during a traffic stop, viewed objectively and in its totality, is reasonably directed toward the proper ends of the stop. By contrast, if the totality of the circumstances, viewed objectively, establishes that the officer, without reasonable suspicion, definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation, this would surely bespeak a lack of diligence. So, too, if the circumstances establish that, over the course of the entire stop, "questions unrelated to the traffic violation constituted the bulk of the interaction between the trooper and the [motorist]."

601 F.3d at 495 (internal citations omitted, brackets in original).

*Stepp* – another case involving two men driving through Middle Tennessee in a rented Hyundai Sonata; being stopped by a law enforcement officer investigating secondary crimes; being

---

[3] The analysis is primarily focused on this period of time rather than the subsequent questioning of Defendant while the license check was pending because it is "clear . . . that an officer may ask unrelated questions to his heart's content, provided he does so during the supposedly dead time while he or another officer is completing a task related to the traffic violation." *Everett*, 601 F.3d at 492 (citations omitted). Defendant does not argue that the computer check took an unreasonable amount of time.

asked both context-framing and extraneous questions; and being subjected to a dog sniff that led to a search uncovering narcotics in the vehicle – provides further guidance. 680 F.3d 651. There, the investigating officer initially collected identifications and registrations from the driver and passenger, respectively, returning to his patrol car to conduct license checks two minutes after pulling the men over. He went back to the stopped vehicle thirteen minutes after that, informing the men that they would receive a warning citation. Then, he asked the driver to exit the vehicle and questioned him for four minutes while writing the citation. Growing suspicious, he questioned the passenger separately for two minutes, requesting permission from each man to search the car. After that, he radioed for the K-9 unit to conduct a drug sniff of the vehicle, questioning the driver for another three-and-a-half minutes while waiting. The Sixth Circuit held that the six minutes of extraneous questioning measurably prolonged the search "because the topics covered more than just context-framing questions and the extraneous questions lasted a not insubstantial amount of time." *Id.* at 663. Even if the six minutes were not an unreasonable prolongation, the Court continued, the three-and-a-half minutes spent waiting for the dog to arrive and perform its sniff were unreasonable because no evidence indicated that either officer on the scene was continuing to investigate the only unresolved issue pending in the traffic stop: a license plate mismatch. *Id.* Absent some investigative effort by the officers related to the original stop, the court held, the delays "amounted to an unreasonable expansion of the initial stop" and required independent reasonable suspicion of criminal activity. *Id.* at 664.

In light of *Everett* and *Stepp*, the Court finds that although Scruggs' conduct arguably approaches the line between an investigative detention that is reasonable in scope and one that is unreasonable in scope, but does not cross it. Early in the stop, after first questioning Defendant but

11

before questioning Gallo, and well before broaching topics that were not "context framing" (e.g., asking about narcotics), Scruggs – who already had a K-9 on the scene – radioed for backup. Contrast those actions with those of the officer in *Stepp*, who radioed for a K-9 unit after completing a thirteen-minute license check and asking six minutes of questions, some extraneous, including requesting consent to search the vehicle. The latter's actions indicate a "definitive abandonment" of the traffic stop investigation, whereas Scruggs stayed within the bounds of reasonable travel-related questioning and directed his overall course of action toward completing the traffic stop. While Scruggs admitted at the suppression hearing that the fastest way to ascertain the validity of the driver's license and complete the traffic stop would have been to run the license check directly after questioning Defendant, a 70-second deviation from that course to ask context-framing questions of a passenger – who may have information relevant to the traffic stop investigation – is not unreasonable, nor does it indicate abandonment of one investigation and the pursuit of another. This is bolstered by the fact that, immediately upon returning to the police vehicle, Scruggs began entering Defendant's license information into his computer.

While waiting on the results of the records check, Scruggs asked Defendant more detailed questions about the trip, and eventually inquired about weapons or narcotics. This was permissible because it did not prolong the stop. *Everett*, 601 F.3d at 492.[4] The same is true for the dog sniff, which began very soon after Defendant refused to consent to a vehicle search and occurred while the records check was pending. Because it did not "extend the duration of the stop" nor did it "cause

---

[4] Morever, because so many of Scruggs' inquiries were of the permissible "context-framing" variety, the "bulk of the interaction" between Scruggs and Defendant cannot be characterized as consisting of questions unrelated to the traffic violation. *Everett*, 601 F.3d at 492, 495.

the officer unreasonably to deviate from the purpose of the initial stop," it was conducted lawfully. *United States v. Bell*, 555 F.3d 535, 539, 543 (6th Cir. 2009).

Before the dog alerted, Scruggs' overall course of action, viewed objectively and in its totality, was reasonably directed toward the proper ends of the stop. Both the scope and duration of this approximately ten-minute traffic stop – measured from the time Defendant stopped his vehicle to the time the K-9 alerted to the presence of drugs (Defendant's timeline, Docket No. 31 at 3-8) – were reasonable in light of the specific factual circumstances presented here.[5] While Defendant may curse his bad luck to get stopped by a police officer who has a drug dog and who knows the constitutional limits of his authority, nothing about this stop was unreasonable.

### B. Reasonable Suspicion of Criminal Activity

Because the Court finds that the scope of the investigatory detention was reasonable, Scruggs did not need an independent reasonable suspicion of other criminal activity to return to the car to question Gallo. Nonetheless, the issue has been fully presented by the parties, and so for the purposes of the record the Court will make findings on the presence or lack of independent reasonable suspicion as the basis of a narcotics investigation.

"Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001). "An officer must not act on an 'inchoate and unparticularized suspicion or 'hunch,' but [on] the specific reasonable

---

[5] Defendant does not challenge the dog sniff as the basis of his seizure or the source of probable cause for the search. *See United States v. Howard*, 621 F.3d 433, 453 (6th Cir. 2010) ("[T]he alert of a properly trained and reliable drug dog 'is sufficient to establish probable cause for the presence of a controlled substance.'") (citation omitted).

13

inferences from which he is entitled to draw from the facts in light of his experience.'" *United States v. Urrieta*, 520 F.3d 569, 573 (6th Cir. 2008) (citation omitted, brackets in original). The Court must look at the totality of the circumstances to determine whether an officer formed the "requisite reasonable articulable suspicion" to prolong the traffic stop. *Smith*, 263 F.3d at 588.

Scruggs wrote and/or testified that his suspicions were aroused for a number of reasons based on the stop and his initial questioning of Defendant: it took the Sonata an extended time to pull over as compared to other traffic stops he has made; Defendant was visibly nervous, so much so that he inadvertently spit on Scruggs' shirt while talking to him; Defendant stuttered when he spoke; Defendant's story about going to visit his cousin and aunt was recited in a vague manner; it seemed unreasonable to drive from Pennsylvania to Texas for a two-day stay; it seemed unusual that a non-relative friend would drive across the country with someone for a two-day family visit; the men were traveling in a rental car; and they were coming from Dallas, Texas, a known drug hub.

Later, after talking to Gallo, Scruggs' suspicions were heightened because Gallo gave a confused response about whether or not he was helping drive the rental car; Gallo's vague account of the reason for the trip ("to hang out for the weekend, basically") was inconsistent with Defendant's, in Scruggs' estimation; and Gallo seemed nervous and took a deep breath before responding that they came from Dallas. Finally, after further questioning Defendant, Scruggs developed further suspicions based on the lack of details in Defendant's story; the fact that he and Gallo had left Dallas in the middle of the night; his change in tone when asked about narcotics; and his attempt to change the subject by complimenting the police vehicle when questioned about drugs and weapons.

Some factors relied on by Scruggs are entitled to little weight. "[T]ravel between population

14

centers is a relativity weak indicator of illegal activity because there is almost no city in the country that could not be 'characterize[d] as either a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center.'" *Urrieta*, 263 F.3d at 576 (quoting *United States v. Andrews*, 600 F.2d 563, 567 (6th Cir. 1979)). Nervousness, meanwhile, "is an unreliable indicator, especially in the context of a traffic stop" because "[m]any citizens become nervous during a traffic stop." *United States v. Richardson*, 385 F.3d 625, 630-31 (6th Cir. 2004) (citation omitted); *but see United States v. Shank*, 543 F.3d 309, 317 (6th Cir. 2008) (citations omitted) ("'[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion'" and "'is generally included as one of several grounds'" in a reasonable suspicion analysis. ). Moreover, there is nothing inherently suspicious about driving a rental car, *United States v. Beck*, 140 F.3d 1129, 1137 (8th Cir. 1998); *see also Stepp*, 380 F.3d at 666, or, for that matter, driving across the country with a friend. Finally, while Defendant may have been slightly slow to bring the vehicle to a complete stop, the Court does not find that he took an unreasonable amount of time, given the busy interstate, non-traditional police vehicle (a Chevrolet Tahoe), and what appears in the video to be debris on the shoulder of the road. Accordingly, it deserves no weight as an indicator of criminal activity.

The one factor that is, by itself, entitled to more substantial weight in the reasonable suspicion analysis is the implausibility and vagueness of the men's travel plans. *See Hill*, 195 F.3d at 272. Scruggs properly considered the reasonableness of driving across the country for a brief visit with one man's family in Dallas, and Defendant's demeanor while describing the trip.

Of course, "even a string of innocent behavior added together may amount to reasonable suspicion of criminal activity." *Richardson*, 385 F.3d at 631 (citation omitted); *see also United*

15

*States v. Bayless*, 201 F.3d 116, 134 (2nd Cir. 2000) (observing that "sometimes innocuous factors such as the time of day and . . . out-of-state license plates take on added significance"). And courts are instructed to consider evidence purporting to support reasonable suspicion not from the vantage point of scholars, "but as understood by those versed in the field of law enforcement. *United States v. Cortez*, 449 U.S. 411, 418 (1981); *see also United States v. Marxen*, 410 F.3d 326, 331-31 (6th Cir. 2005) ("[A]n officer's specialized training and experience may permit him to make inferences from and deductions about the cumulative information available to him that 'might well elude an untrained person.'") (citation omitted). Scruggs testified that, in his experience as a drug interdiction officer, the "paint by numbers" process of combining these seemingly innocuous factors made him very suspicious. And indeed, two unrelated men traveling across the country together to visit one man's relative, for a vaguely described visit whose duration lasted roughly as long as the round-trip travel, may have provided a useful hunch for an experienced narcotics investigator like Scruggs – particularly if the driver seems to be nervous or evasive.[6]

But, based upon the totality of the circumstances, the factors relied upon by Scruggs did not in aggregate establish reasonable suspicion that other criminal activity was afoot at the time he ceased his initial questioning of Defendant and went to question Gallo. One reasonable suspicion determination is seldom a useful "precedent" for another, *United States v. Townsend*, 305 F.3d 537, 542 (6th Cir. 2002) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 n. 11 (1983)), but *Townsend* is instructive here. There, an officer based his suspicion determination on several factors: unusual behavior by the defendant, including behaving extremely cooperatively; dubious travel plans that

---

[6] Like defense counsel, the Court found Scruggs' testimony to be candid and highly credible. (*See* Docket No. 42 n. 2).

16

involved late night travel; travel between "source cities" for narcotics; the presence of three cellular telephones and a Bible in the passenger compartment, purportedly typical of drug couriers; rolls of currency in the defendants' pockets; a previous weapons charge arrest; nervous behavior; an automobile cluttered with food wrappers and clothing; and a driver who was not the registered owner of the car. *Id.* at 542-45. Finding that "this case lacks any of the stronger indicators of criminal conduct that have accompanied these minor factors in other cases," the Sixth Circuit rejected them as the foundation for a reasonable suspicion of criminal activity permitting their continued detention for a canine drug sniff. *Id.* at 545.

At the time Scruggs went to question Gallo, he did not rely on any strong indicators of criminal conduct such as a prior arrest or ongoing investigation, nor had he yet developed further detail that would expose inconsistencies in the two men's stories or continued vague, evasive, and nervous behavior. *Cf. Torres-Ramos*, 536 F.3d at 553 (finding reasonable suspicion based on a mix of weak and strong indicators, including among the latter category inconsistent stories and an ongoing DEA wiretap), *and United States v. Rodriguez*, 485 F. App'x 16, 20 (6th Cir. 2012) (finding reasonable suspicion based on evasive behavior, a car air freshener, travel between drug hub cities, an implausible story about a Thursday night bachelor party, and the failure to know the date of the wedding). What he learned and observed during his brief conversation with Defendant may have given him a hunch that something illicit was afoot, but at that point it did not rise to the level of articulable reasonable suspicion of ongoing criminal activity, and thus would not justify converting the traffic violation investigation into a narcotics investigation.

However, because the Court finds that the traffic stop as a whole was executed reasonably, *see supra* Sec. II. A., Scruggs' lack of independent reasonable suspicion at the moment he went to

17

question Gallo does not render Defendant's continued detention unconstitutional.

### III. **CONCLUSION**

For the foregoing reasons, the Court will DENY Defendant's Motion to Suppress (Docket No. 30).

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE